**Robert E. ORRELL (Claimant), Petitioner,**

**v.**

**B.F. GOODRICH (Employer), Own Risk and The Workers' Compensation Court, Respondents.**

**No. 69842.**

Supreme Court of Oklahoma.

Feb. 13, 1990.

---

Richard A. Bell, Norman, for petitioner.

W. Neil Wilson, Wallace, Owens, Landers, Gee, Morrow, Wilson, Watson, James & Coiner, Miami, for respondent.

LAVENDER, Justice:

Claimant, Robert Orrell, worked at B.F. Goodrich's tire manufacturing plant for 31 years, retiring in 1986. He filed a claim for compensation with the Oklahoma Workers' Compensation Court alleging exposure to certain chemicals at Goodrich caused reduced breathing capacity and injury to his lungs and upper respiratory system. Employer answered denying the claim. A hearing was held before a trial judge. Claimant testified concerning his work history, exposure to certain chemicals and his experience with dyspnea, i.e. shortness of breath. Each side presented depositions, with medical reports attached of one doctor that had examined claimant. Claimant's doctor (Dr. A) opined claimant had a Class 2 impairment due to injury to his lungs caused by his 31 years with Goodrich. He rated claimant's impairment at 20% perma-

nent partial. Goodrich's doctor (Dr. M) found no impairment and alternatively stated even if claimant had any respiratory impairment "[O]ne would not expect it to be from his work at ... Goodrich."

At the hearing claimant objected to the deposition of Dr. M as lacking in probative value. The deposition was admitted with the trial judge noting the objection. Goodrich objected to the deposition of Dr. A on the basis of competency and probative value. The deposition was admitted subject to said objections. Claimant also orally made a motion for appointment of a third physician to conduct an independent medical examination pursuant to 85 O.S.Supp.1986, § 17. Claimant had earlier filed a written motion. The trial judge took this motion and the rest of the matter under advisement.

A week after the hearing the trial judge entered his order denying the claim. He ruled "[C]laimant did not sustain an accidental personal injury or occupational disease which was causally related to his work ...." He also sustained Goodrich's objection to the competence of the deposition of Dr. A "[A]s being in conflict with the AMA Guides ...." Appointment of a third physician was denied because "[T]here [was] no competent medical to show [ ] claimant sustained any ill effect to his breathing from his work ...."

Claimant sought review and the matter was assigned to the Court of Appeals. In an unpublished opinion that court ruled it was Goodrich's medical evidence that was incompetent as not in compliance with the Guides, that claimant's medical evidence *was* in compliance with the Guides and, thus, based on our decision in *LaBarge v. Zebco*, 769 P.2d 125 (Okla, 1988), remanded with directions to enter an award of 20% permanent partial disability based on Dr. A's deposition, the only evidence it deemed competent.

The issues we must decide in this case are 1) did the trial judge err in ruling claimant's medical evidence was not in compliance with the American Medical Association Guides to the Evaluation of Permanent Impairment and not considering it and 2) did the Court of Appeals err in determining it was Goodrich's medical evidence that could not be considered because not in compliance with the Guides and, thus, in remanding with instructions to enter an award of 20% permanent partial disability in favor of claimant based on claimant's medical evidence, the only evidence it deemed to comply with the Guides. We hold the trial judge and Court of Appeals erred in their consideration of this case because the medical evidence of both claimant and employer was competent, i.e. admissible. The medical evidence of both parties was also in substantial compliance with the Guides and, therefore, was of sufficient probative value to be relied on by the trial judge. Accordingly, because the trial judge failed to consider claimant's evidence the case must be remanded to the trial judge so he, as fact-finder, can initially make a determination of the extent, if any, of job-related impairment.

■ The claimant's medical proof, as noted, was offered by the deposition of Dr. A. Dr. A's written medical report was attached to the deposition, but it was not offered as a separate exhibit. In such a case we properly look to the deposition testimony as the principal medical evidence in the case.[1] Goodrich couched its objection to the deposition testimony of Dr. A both in terms of competency and probative value. At the hearing Goodrich stated it *was not competent* because the medical opinion was not consistent with the Guides and the doctor's own testing showed claimant was not impaired. Goodrich apparently equates this objection as being synonymous with questioning the admissibility of the evidence. Instead, we view such an objection as going to the probative value of the evidence, if any, and nothing leads us to believe a valid objection was ever made to the admissibility of Dr. A's deposition. Although we are not completely certain how the trial judge viewed the objection it appears his view coincided with that of Goodrich or, at least, he determined the medical

---

1. *Wheat v. Heritage Manor*, 784 P.2d 74, 77, f.n. 8 (Okla.1989).

evidence submitted by claimant could not be considered by him in any determination of whether claimant was impaired and, if so, whether the impairment was job-induced. We hold he erred in such regard.

Recently, we have delineated the distinction between an objection on competency grounds and one made on grounds of probative value. In *Whitener v. South Central Solid Waste Authority*, 773 P.2d 1248 (Okla.1989) we stated:

> In compensation practice, an *objection* to the *"competency"* of a medical report is directed to the exhibit's *admissibility* on hearsay or other legal grounds. Another type of "objection" known to the practice addresses itself to the *probative value* of a physician's letter-report. .... The real issue raised by the challenge to the exhibit's probative effect is whether the evidence—*once admitted*—is *probative* of the elements it seeks to establish or, to use simpler parlance, whether it tends to prove that which it was adduced to show. In sum, a *true objection* resists only the exhibit's legal *admissibility*, while a challenge for lack of probative value—the approximate functional counterpart of a district-court demurrer to the evidence—tests the legal sufficiency of targeted written proof to establish the evidentiary elements for which it was adduced. (emphasis in original) *Id.* at 1249 f.n. 1.

■ We believe the distinction between the legal import of a competency objection and one based on probative value is normally applicable whether or not the objection is being made solely to a written medical report or deposition testimony.[2] We also view Goodrich's arguments on appeal in regard to the medical evidence of Dr. A to be an attack based on probative value, rather than a true attack on its admissibility. We, thus, must determine if the medical opinion of Dr. A was, indeed, consistent with the Guides in relation to rating impairment to the respiratory system.

Goodrich argues Dr. A's opinion was not consistent with the Guides based on two interrelated positions. It asserts because Dr. A admitted in his deposition the physiologic test results of pulmonary function he performed were above the lower limits of normal according to criteria established by the Guides and, according to Goodrich, at least one of the pertinent physiologic test results must be abnormal, a rating of 0% impairment was compelled. It also argues Dr. A's opinion was impermissibly based *solely* on Dr. A's interpretation of claimant's complaint of dyspnea. We believe Goodrich is in error as to both positions because it misinterprets the Guides in relation to these matters.

■ Certain pulmonary function tests generally known as spirometric tests, consisting of ventilatory function measurements, were performed by both Dr. A and Goodrich's own doctor.[3] The record is undisputed that when one correctly applies the formulas called for by the Guides in relation to these *physiologic* tests claimant would fall under the 0% impairment classification.[4] Dr. A agreed with this in his deposition. However, according to Dr. A, he took into consideration these physiologic test results in the impairment rating process, along with claimant's dyspnea and any pertinent personal factors of claimant. We believe in doing so Dr. A's opinion was

---

**2.** Medical evidence may be offered in three ways: 1) a verified or declared report, 2) a deposition, or 3) oral examination in open court. 85 O.S.Supp.1987, Ch. 4, App., Rule 20, Rules of the Workers' Compensation Court.

**3.** Under the Guides measurement of ventilatory function utilizing these tests is made up of three component parts: 1) forced vital capacity (FVC), *the largest amount or volume of air a patient is able to exhale from his lungs;* 2) forced expiratory volume in the first second (FEV-1), *the amount of air that can be blown out in the first second of forced exhalation* and;

3) their ratio (FEV-1/FVC). American Medical Association Guides to the Evaluation of Permanent Impairment, 2d ed., Ch. 3, The Respiratory System, pp. 85–101 (1984); *See also Whitener v. South Central Solid Waste Authority*, 773 P.2d 1248 (Okla.1989).

**4.** An explanation of how these ventilatory function measurements are arrived at and the formulas pertinent thereto utilized by the Guides is found at AMA Guides, *supra* note 3 at 87–96. *See also Whitener, supra* note 3 at 1251–1252.

in substantial compliance with the Guides in effect at the time of his evaluation.[5]

Table 1—Classes of Respiratory Impairment indicates an impairment rating of 10–25% may be given if a claimant experiences dyspnea with fast walking on level ground or when walking on a hill or if the patient can keep pace with persons of the same age and body build on level ground, but not on hills or stairs, even if the spirometry results produce values within the lower limit of normal utilizing the formulas called for by the Guides.[6] Table 1 specifically indicates that such a range of impairment may be given when such dyspnea is experienced *or* when one of the ventilatory function tests involved here are abnormal to the degree required. As we read Dr. A's deposition he views claimant's complaints of dyspnea to fall under the criteria established in Table 1 for a finding of such impairment. As noted above Dr. A gave claimant a rating of 20% permanent partial impairment.

Goodrich points to a footnote to Table 1 and the textual discussion contained in the Guides for use and interpretation of the spirometry results as mandating, *in every*

case, that one of the test results must be abnormal for an impairment rating to be made.[7] We do not read the material relied on to stand for the proposition Goodrich posits. The language merely means that *if* a medical practitioner is going to utilize these ventilatory test results as the *sole* function of an impairment rating at least one of the test results *must be abnormal to the degree indicated in Table 1*. It does not mean, as Goodrich asserts, that no impairment rating may be given under the applicable Guides in the absence of such an abnormal result, if other criteria in Table 1 does indicate impairment, even in the face of results within permissible limits. Here Dr. A was of the opinion after taking into consideration these results, along with the complaints of dyspnea and pertinent personal factors that claimant was impaired. Although the applicable Guides indicate dyspnea may not be the sole criterion for evaluation of impairment, both Table 1 and the text preceding it indicate dyspnea, when taken into account along with other physiologic and personal factors may give rise to an impairment rating.[8] Thus, we

---

5. 85 O.S.Supp.1987, § 3(11) required the doctors to evaluate any impairment utilizing the latest AMA Guides. The 1984 AMA Guides were the ones in effect at the time of both evaluations. Said Guides have been supplanted by the American Medical Association Guides to the Evaluation of Permanent Impairment, 3rd ed. (1988). The Respiratory System is now found in chapter 5 at pp. 107–118 of the current Guides, rather than chapter 3, as found in the 1984 Guides.

6. Table 1—Classes of Respiratory Impairment is found at pg. 86 of the 1984 Guides. It presents the criteria for rating permanent impairment. According to the Table four "Classes" (ranging from 0%–100%) of impairment are included, which depend on certain physiologic test results and varying signs of dyspnea. A rating between 10%–25% falls within class 2 of the Table and is considered mild impairment.

7. The textual discussion, which is essentially the same as the footnote, provides as follows: "At least one of these measures of ventilatory function should be abnormal to the degree required in a given class definition [in Table 1] if an impairment is to be rated in that class." AMA Guides, *supra* note 3 at 89.

8. The 1984 AMA Guides, *supra* note 3 at 85 provides as follows when discussing the rele-

vance of dyspnea as a criterion for evaluation of impairment:

> *Dyspnea may not be used as the sole criterion for evaluation of impairment.* The causes of dyspnea are multiple and complex. Individual responses to a given degree of dyspnea vary and are influenced by factors unrelated to the extent of lung disease, such as difficulty in verbal communication, preoccupation with health, socioeconomic status and educational background. *Therefore, the symptom of dyspnea should be considered along with other physiologic and personal factors.*

This language is consistent with Table 1 which as noted in the text indicates dyspnea *or* abnormal results on the pulmonary function tests may be used to rate impairment. Our decision in this regard is also buttressed by review of the recently enacted 1988 AMA Guides, *supra* note 5. The new Guides specifically provide that the severity of dyspnea "[D]oes not constitute a criterion upon which impairment of lung function is based." *Id.* at 108. Table 8—Classes of Respiratory Impairment, the counterpart to Table 1 in the 1988 Guides, also does not include dyspnea as a criterion. *Id.* at 117. Although the obvious import of this change was an attempt to utilize more objective criteria in rating respiratory impairment, it does not impact our decision concerning the 1984 Guides, applicable to

view the opinion of Dr. A, expressed in his deposition, to be in substantial compliance with the Guides and the trial court, as fact-finder, erred in failing to consider it in determining the extent, if any, of claimant's job-induced impairment.[9]

■ The medical evidence of Goodrich, as noted, was via the deposition of Dr. M, with medical report attached. As with our discussion concerning Goodrich's objection to Dr. A's deposition we view claimant's objection to Goodrich's medical as going only to its probative value, rather than its admissibility. We, thus, must determine if it was of sufficient probative value to be relied on by the fact-finder.

Dr. M initially was of the opinion claimant suffered from no permanent partial impairment. He also indicated that even if claimant did suffer from any respiratory impairment, "[O]ne would not expect it to be from his work at B.F. Goodrich." The Court of Appeals initially determined the quoted statement as to causation was speculative and was insufficient to support a valid medical assessment concerning the cause and effect of claimant's condition. We believe the Court of Appeals erred in such regard because if Dr. M's opinion of no impairment was properly made under the Guides, even assuming the alternative "speculative" opinion as to causation was couched in impermissible equivocal terminology, such would not necessarily undercut the validity of the no impairment assessment. After thoroughly reviewing the

medical evidence of Dr. M we hold his opinion of no impairment was in substantial compliance with the Guides.[10]

The Court of Appeals raised an issue no one theretofore had raised as part of its rationale for deeming Goodrich's medical evidence not competent to support a conclusion of no permanent partial impairment. It felt the applicable Guides required Dr. M to perform an additional physiologic test called a diffusing capacity of carbon monoxide test or DCO test because it viewed the record as showing claimant's respiratory complaints were of greater severity than the spirometry test results indicated. The Court of Appeals was mistaken in its view.

The DCO measures the amount of carbon monoxide which diffuses across the alveolar-capillary membrane in a specified amount of time. The 1984 Guides provide that: "[t]he single breath DCO should be performed when a patient has respiratory complaints that are of greater severity than the observed spirometry results would indicate."[11] The Court of Appeals evidently viewed this language as a mandatory command to conduct such a test any time the *subjective* complaints of a claimant as to respiratory problems are not consistent with the spirometric test results, i.e. when the test results are within the lower limits of the normal range. Our view is quite different.

First of all, as we view the medical evidence presented by Dr. M there is nothing to indicate claimant's complaints to him

this case, which specifically *did* include dyspnea as a criterion, as long as the physiologic and personal factors specified in the Guides were considered.

9. Goodrich does not argue here that Dr. A's evaluation lacked sufficient probative value as to causation or job-relatedness. Its arguments are limited solely to the propriety of the impairment rating, as we read them.

10. In view of our holding on the impairment issue we need not and do not express a view as to the Court of Appeals' determination on this "speculative" causation issue, nor in regard to its perceived inadequacy of Dr. M's opinion as to other mainly causative factors. These latter factors dealt mainly with exactly what chemicals claimant was exposed to at Goodrich. We only say in such regard that neither doctor conducted a detailed analysis as to exactly what

chemicals claimant *himself was exposed to*, although attached to Dr. A's report was a list of chemicals supposedly present at Goodrich during claimant's employment there. Neither the levels of these chemicals in the work environment or claimant's *particular exposure* to all of them was known by either doctor as we view the record, although apparently Dr. M ruled out the ones claimant told him he was basing his claim on as causing detrimental effect on claimant's respiratory system. In any event, neither party on remand is foreclosed from presenting updated or new medical evidence consistent with current evaluations of claimant, which could include more detailed analysis of these causative issues.

11. 1984 AMA Guides, *supra* note 3 at 97.

were of greater severity than the ventilatory function measurements obtained via the spirometry results. Dr. M specifically indicated as to dyspnea that the history given to him concerning it by claimant was consistent with these ventilatory function test results. In other words, as we view the medical opinion of Dr. M he did not view claimant as suffering from any significant or quantifiable dyspnea.[12]

Secondly, we believe when one is dealing with what the Guides recognize involve subjective variables,[13] whether subjective complaints are of greater severity than the spirometry results would indicate enters an area of medical discretion which a court should not normally delve into. The decision as to whether such complaints *are actually* inconsistent or of greater severity than the more objective physiologic test results, so that the DCO test should be performed, under the 1984 Guides are within an area of medical expertise and are not generally subject to second guessing by a court. For all of the above reasons we perceive no error in Dr. M's failure to perform a DCO test.

DCO test results potentially play a role in all four classes of respiratory impairment under the 1988 AMA Guides.[14]

Dr. M opined claimant suffered from no permanent partial impairment based on his examination of claimant, which included consideration of the spirometric test results from the ventilatory function measurements obtained. Here it is undisputed the physiologic test results of ventilatory function performed *were all* within permissible limits. Thus, the Court of Appeals erred in its ruling as to the medical evidence presented by Goodrich as that evidence was in substantial compliance with the applicable Guides.

In that the trial judge erroneously did not consider claimant's evidence the fact-finder never made an initial determination based on the conflicting, probative evidence presented. In such a situation the matter must be remanded for reconsidertion so that the fact-finder can make the initial determination, which was not done here.[15] In that this matter is being remanded for reconsideration, if the parties choose to present new evaluations and medical evidence such would be controlled by the 1988 AMA Guides by the force of 85 O.S.Supp. 1987, § 3(11), *supra* note 5, which mandates evaluation of impairment utilizing the latest AMA Guides.

---

**12.** The Court of Appeals chastised Dr. M for not explaining the significance of claimant's shortness of breath experienced after climbing only three flights of stairs. The simple answer to this is that, although claimant testified he told both Dr. A and M this and Dr. A's report so indicates, *neither the deposition or report of Dr. M indicates claimant told him this.* Dr. M's report indicates claimant told him he could go up as many stairs as he needs to if he takes his time. As such, the matter goes merely to the credibility or weight of Dr. M's opinion and is not a basis for concluding the entirety of the opinion is flawed because the DCO test was not performed. In fact, as far as this record is concerned Dr. A also did not perform a DCO test.

**13.** In relation to dyspnea the 1984 AMA Guides indicate individual responses to any given degree of dyspnea vary and are influenced by factors unrelated to lung disease. 1984 AMA Guides, *supra* note 8 at 85. This is the stated reason the 1984 Guides did not allow dyspnea to be utilized as the *sole* criterion for evaluation of impairment.

**14.** The 1988 Guides provide in pertinent part:

Diffusing capacity of carbon monoxide (Dco): The single breath Dco should be used for the evaluation of all levels of impairment. The methodology for performing single breath Dco described by the ATS should be followed.

\*   \*   \*   \*   \*   \*

The interpretations of the FVC, FEV–1, FEV–1/FVC ratio and Dco are given in Table 8. Results for all four measures of lung function must be in the normal range for a person to be considered not impaired according to physiologic parameters. At least one of these measures should be abnormal to the degree described in a given class definition if an impairment is to be rated in that class.
1988 AMA Guides, *supra* note 5 at pp. 112–113. However, the 1988 Guides are not before us at this time.

**15.** *Wheat, supra* note 1, 784 P.2d at 78–79. In view of our decision here that each sides medical evidence should have been considered, *LaBarge v. Zebco,* 769 P.2d 125 (Okla.1988), is inapplicable. This is not a case where one medical opinion is uncontroverted by an opposing opinion. Both opinions should have been considered.

The Court of Appeals opinion is VACATED, the trial judge's order denying permanent partial disability is VACATED and the matter is REMANDED to the trial judge for proceedings consistent with the views expressed herein.[16]

HARGRAVE, C.J., OPALA, V.C.J., and HODGES, SIMMS, DOOLIN, KAUGER and SUMMERS, JJ., concur.

ALMA WILSON, J., concurs specially.

ALMA WILSON, Justice, concurring specially:

I agree this case should be remanded to the trial court to allow litigants an opportunity to offer additional medical evidence as we permitted in *Wheat v. Heritage Manor*, 784 P.2d 74 (Okla.1989).

**16.** The Court of Appeals, although for a different reason, upheld the decision of the trial judge in refusing to appoint an independent medical examiner. This issue is not before us as claimant failed to challenge the ruling of the Court of Appeals by his own petition for Certiorari.