2002 OK CIV APP 42

**Glen HEREDEN, Petitioner,**

v.

**MULTIPLE INJURY TRUST FUND and Workers' Compensation Court, Respondents.**

No. 95622.

Court of Civil Appeals of Oklahoma, Division No. 2.

June 26, 2001.

Certiorari Denied Sept. 25, 2001.

Susan Jones, Wilson Jones, P.C., Tulsa, OK, for Petitioner.

Georgiana Peterson, Pray, Walker, Jackman, Williamson & Marlar, Oklahoma City, OK, for Respondent.

JOHN F. REIF, Vice–Chief Judge.

¶ 1 Glen Hereden seeks review of the order entered by the three-judge panel on his claim for benefits from the Multiple Injury Trust Fund. Mr. Hereden contends that the three-judge panel erred by not considering pre-existing impairment in his left eye in deciding issues of material increase and permanent total disability.

¶ 2 There was no dispute that Mr. Hereden injured his left eye in 1982 and developed a traumatic cataract on the lens as a result. There was also no dispute that the lens of his left eye was surgically removed and an artificial intraocular lens was surgically implanted to replace it. The controversy both in the workers' compensation court and here on review has been over the assessment of impairment for this prior injury and treatment. The trial court declined to consider the injury and corrective treatment on the ground that there was no obvious and apparent injury to the left eye at the time of the latest compensable injury. The three-judge panel vacated this portion of the trial court's order, but also declined to consider the injury and treatment. The three-judge panel ruled the "artificial lens is a permanent improvement to claimant's vision [and] not in the nature of a prosthesis [so that claimant has no] loss of sight ... within the meaning of *85 O.S. [Supp.2000] § 171*."

¶ 3 The principal complaint that Mr. Hereden has raised about the three-judge panel's order is the court's consideration of the "correction" in his sight that resulted from replacement of the lens. He argues that any impairment in his left eye from the 1982 injury must be determined on the basis of uncorrected vision as provided in Workers' Compensation Court Rule 33, 85 O.S. Supp. 2000, ch. 4, app. Mr. Hereden takes the position that the traumatic cataract caused a total loss of his natural ability to see which became permanent upon the surgical removal of the affected lens. He asserts that the implantation of the lens did nothing more than correct the loss of natural sight by artificial means. Some support for this position is found in *Reynolds v. State Industrial Comm'n,* 1949 OK 20, ¶¶ 2, 8, 202 P.2d 994, 996 and Syllabus 2, which held "the State Industrial Commission is not required, under the Workmen's Compensation Act, to take into consideration that the effect of a permanent injury to the eye might be minimized by artificial means in fixing the award for such permanent injury." (Citations omitted.)

¶ 4 Mr. Hereden also believes that the medical evidence in the record supports his position. The record reflects that neither the court-appointed independent medical examiner nor the medical expert for the Fund offered any opinion about Mr. Hereden's vision prior to the surgery to remove his injured biological lens and to implant the artificial lens. Mr. Hereden's medical expert reported that "visual acuity prior to surgery in the left eye was 20/200." This is sufficient loss to constitute a total loss.

¶ 5 If Rule 33 and § 171 were the only authority to consider, and were literally construed, Mr. Hereden would indeed prevail under the evidence in this case. However, we do not agree with Mr. Hereden's characterization of the implanted lens as a mere correction of Mr. Hereden's vision. We likewise do not agree with the three-judge panel's ruling that the implanted lens was not in the nature of a prosthesis. We hold that the implanted lens was indeed a prosthetic device and that the effect of such a device on impairment is different than the effect of a corrective device or means contemplated by *Reynolds* and Rule 33.

¶ 6 Under Mr. Hereden's argument, an uncorrected loss of natural or biological sight

is equated to the total impairment of sight as required by § 171. However, impairment is not based on biological loss, but on "anatomical or functional abnormality or loss." *85 O.S. Supp.2000 § 3* (14). The very purpose and nature of a prosthetic device is to replace a missing part or function of the human body. This definition is provided by statute, albeit in the sales tax code where sales of prosthetic devices by medical practitioners and purchases pursuant to prescriptions are exempt from sales tax. *See 68 O.S.1991 § 1357.6.* In construing a similar provision of the Ohio tax code, the Supreme Court of Ohio has ruled that an intraocular lens which replaces a patient's natural lens, is a prosthetic device, so that the sale of the lens by an ophthalmologist to his patient is exempt. *M.S. Osher, M.D. & R.S. Kerstine, M.D., Inc. v. Limbach,* 65 Ohio St.3d 312, 603 N.E.2d 997 (1992).

¶ 7 In § 15 of the Act, the Legislature has expressly required that prosthetic devices be provided in cases of loss of one or more eyes (which includes loss of sight of 20/200 and greater). *85 O.S.1991 § 15.* This section also requires repair or replacement of a prosthetic device (which has itself replaced a missing biological body part) when the prosthetic device is damaged by a compensable job-related injury. We believe that it is highly unlikely that the legislature would require the provision of a prosthetic device, like an implanted intraocular lens, to replace an injured biological body part so that anatomical or functional use can be restored, and then treat the prosthetic device as a mere correction of deficiency to be disregarded in determining impairment to vision (*i.e.,* anatomical or functional loss of sight).

■ ¶ 8 We hold that where a prosthetic device has replaced a missing biological part or natural function of the human body, the inquiry of impairment does not end with the biological or natural loss; the inquiry extends to determining the degree of anatomical or functional loss that remains after the prosthetic device is in use.[1] We further hold that *Special Indemnity Fund v. Stoveall,* 1962 OK 26, ¶ 8, 368 P.2d 847, 848, provides the necessary guidance for determining when and what degree of anatomical or functional loss that remains after a lens implant will satisfy the requirements of § 171.

■ ¶ 9 In *Stoveall,* the court said that "whether claimant was correctly adjudged to be a 'physically impaired person' within the meaning of [§ 171] presents a jurisdictional question and [an appellate court] is neither bound nor concluded by the determination below." *Id.* at ¶ 4, 368 P.2d at 848 (citation omitted). This case reaffirms: "Industrial blindness in an eye is treated under the Workmen's Compensation Act as synonymous with complete destruction of sight in such eye and hence constitutes total loss of vision in the organ so impaired." *Id.* at ¶ 7, 368 P.2d at 849 (citations omitted). This case further points out that "[t]he provisions of [§ 171] do not require ... the loss of an eye be 'obvious and apparent from observation or examination by an ordinary layman' [or] be established by a prior award of compensation therefor." *Id.* at ¶ 8, 368 P.2d at 849. Most importantly, this case holds: "The controlling issue below, as well as on review, is whether, at the time of his *last accidental injury* ... claimant was a physically-impaired person because he was either industrially blind, or had a complete loss of vision in one eye." *Id.* at ¶ 9, 368 P.2d at 849.

¶ 10 In the instant case, we have independently reviewed[2] the medical evaluations of Mr. Hereden's left eye that were done for purposes of his claim against the Fund. We

---

1. In reaching this conclusion, we are cognizant that prosthetic devices greatly differ in their ability to restore anatomical or functional use of the missing biological body part. We recognize that not all prosthetic devices have the ability to restore anatomical or functional use to the same extent that an artificial intraocular lens can restore lost sight to near normal. We make this observation because we do not intend this holding to be interpreted to mean that every case involving a prosthetic device will automatically disqualify the injured worker as a previously impaired person. Each case will depend on expert medical evidence concerning the effect of the prosthetic device on impairment.

2. *Special Indemnity Fund v. Choate,* 1993 OK 15, ¶ 15, 847 P.2d 796, 802 (citing *Special Indemnity Fund v. Hunt,* 1948 OK 58, ¶ 11, 190 P.2d 795, 798–99).

note that Mr. Hereden's medical expert did not report any vision measurements that may have been taken in the course of the doctor's examination on January 2, 1999. The report of Mr. Hereden's medical expert only addresses Mr. Hereden's visual acuity *prior to surgery in the left eye.*

¶ 11 We specially note that the report of Mr. Hereden's medical expert was dated April 20, 2000, and mentions that the doctor considered prior medical records, including those of the court-appointed independent medical examiner and the Fund's medical expert. Mr. Hereden's medical expert did not take issue with anything recorded or reported by these doctors concerning Mr. Hereden's vision. In particular, Mr. Hereden's medical expert did not dispute or question the observation of the independent medical examiner that "Mr. Hereden had equally reactive pupils bilaterally. His vision was within normal limits. There was no abnormality of ocular movement noted." Mr. Hereden's medical expert also did not dispute or question the observations and measurements reported by the Fund's medical expert on April 2, 1998. The Fund's medical expert reported the following:

*Vision*

Inspection: The left pupil was irregularly shaped

Extraocular movements: Intact

Pupils: Equal, round and reactive to light and consensual reflex

Visual Fields: Intact

Fundoscopic exam: Normal

Distant visual acuity (Snellen wall chart):

|  | Right | Left |
|---|---|---|
| Uncorrected | 20/200 | 20/50 |
| Corrected | 20/25 | 20/25 |

¶ 12 In addition to the medical reports, the court-appointed independent medical examiner testified in his deposition that he tested the uncorrected vision in both of claimant's eyes and found "[n]ear vision in the left eye was 20/40; near vision in the right eye was 20/30; left eye, far vision, 20/25; and the same on the right eye." The IME further testified that he considered these measurements to be "within normal limits" because

"normally people don't start getting ... glasses until [their vision is] 20/40 or worse."

¶ 13 As concerns Mr. Hereden's vision at the time of his last injury in December of 1989, the deposition reflects the following exchange:

Q. And then regarding his left eye, apparently the injury was in 1983 and Dr. Galusha did perform the implant surgery, and so at the time of the most recent injury, which was December of '89, if you evaluate the claimant at that point in time, to tell whether or not he was a previously impaired person as to his left eye, he had normal vision in his left eye?

A. Normal enough to work and drive.

Q. Because he had the implant, correct?

A. Right, because of the implant.

Q. And he didn't have any—you couldn't—I mean, that was his uncorrected vision, even though there was a—

A. A lens.

Q.—an implanted lens?

A. Right.

Q. It wasn't his original natural lens?

A. For different reasons he had the lens procedure done, but it's the same thing as a cataract surgery. Immediately before that surgery people can hardly see, most of them can't drive; they have the surgery, after recovering from the surgery they see well, they read, they drive. They can move around just fine, whether they're 65, or 80, or 93.

¶ 14 When an appellate court "independently weigh[s] the evidence concerning physically impaired status," and finds undisputed medical evidence supporting the decision of the workers' compensation court on the issue of pre-existing impairment, the appellate court will uphold the workers' compensation court decision where there is "no rationale to deviate from the undisputed medical evidence presented on this point." *Special Indemnity Fund v. Choate,* 1993 OK 15, ¶¶ 16, 17, 847 P.2d 796, 802. While we

find *no evidence* to support the three-judge panel's decision that "the artificial lens is a permanent improvement to claimant's vision," we do find undisputed medical evidence that "[c]laimant clearly has not suffered loss of sight in the LEFT EYE within the meaning of *85 O.S. § 171.*" Because we have been provided no rationale to deviate from the undisputed medical evidence on this point, we sustain the order under review.

¶ 15 SUSTAINED.

¶ 16 GOODMAN, P.J., and COLBERT, J., concur.